# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

TERRY DEGRAW,

        Plaintiff,

    vs.                      **Case No. 09-4016-RDR**

EXIDE TECHNOLOGIES,

        Defendant.

---

## MEMORANDUM AND ORDER

Plaintiff has filed an action alleging that defendant violated state law by retaliating against plaintiff for exercising his rights under the State of Kansas workers' compensation statute. Plaintiff also alleges that defendant violated the Family and Medical Leave Act ("FMLA") by unlawfully retaliating against and interfering with plaintiff's exercise of his FMLA rights. This case is before the court upon defendant's motion for summary judgment.

## I.  SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if it is demonstrated that the movant is entitled to judgment as a matter of law on the basis of facts to which there is no genuine dispute. The court must determine "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment." Id. at 248. There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court may not act as the jury and determine witness credibility when it examines the record upon a summary judgment motion. Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342, 346 (10th Cir. 1986) cert. denied, 480 U.S. 947 (1987). The evidence and all reasonable inferences therefrom are construed in the light most favorable to the nonmoving party. Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.) cert. denied, 537 U.S. 816 (2002).

II. UNCONTROVERTED FACTS

Unless noted otherwise, the following facts are either uncontroverted or shall be considered uncontroverted for the purposes of this memorandum and order.

Plaintiff was hired by defendant on or about August 20, 2001 to perform the job of a "material handler" at defendant's plant in Salina, Kansas. When plaintiff was hired he received instructions regarding defendant's policy for reporting workplace injuries. The physical requirements of the job included: 1) manually handling 5-pound to 80-pound batteries; 2) occasionally (with assistance)

2

lifting batteries weighing between 80 and 120 pounds; 3) moving or carrying wood pallets weighing up to 40 pounds over short distances; and 4) continuous standing, walking or riding a truck twelve hours a day. In 2005, plaintiff signed a job description for the position of senior material handler. The job description stated that a senior material handler should among other tasks: perform all material handler functions; occasionally lift 30 to 40 pounds; and engage in walking, sitting, lifting, bending and twisting.

Plaintiff's medical history shows that plaintiff complained of back pain and missed work at different times over a period of years. Plaintiff had a four-wheeler accident in 2002 which caused some back pain and led plaintiff to miss a few days of work. An x-ray showed mild degenerative change at the L5-S1 vertebra.

Plaintiff also missed five months of work in 2003 because of a hernia operation and a motorcycle accident which happened while he was recovering from the operation.

In January 2005 plaintiff fell from a ladder in his garage and injured his back. He missed a few days of work. In August 2005 plaintiff's doctor – Dr. Bossemeyer – diagnosed plaintiff with left leg numbness secondary to an irritated nerve from a low back strain. He noted that plaintiff had had episodes of low back pain on and off for many years.

Plaintiff saw Dr. Bossemeyer on June 2, 2006 complaining of

low back pain and pain radiating into his right leg.  Plaintiff did not indicate to Dr. Bossemeyer that there was a specific cause of the pain and did not say that his work activities caused the pain. Dr. Bossemeyer diagnosed plaintiff with possible L5-S1 radiculopathy, prescribed pain medication, and instructed plaintiff to take some time off work.

On June 7, 2006 plaintiff had a CT scan.  The radiology report contained the following impression:

> A prominent right paracentral disk herniation is . . . felt to be present at L4-L5 that measures 1.2 x 0.8 cm and is associated with right nerve root compression and acquired central canal narrowing to 7 mm.

> Moderate degenerative disk disease at L5-S1 with moderate to severe narrowing of the disk space and face joint arthropathy.  The central canal caliber remains within normal limits but there is right neural foraminal stenosis with right nerve root compression.

Doc. No. 95, Exhibit 11.  The radiologist recommended a follow-up MRI to confirm the findings.  But, as will be discussed, an MRI was not ordered until December 2006.

Plaintiff had an epidural steroid injection on June 14, 2006 with minimal results.  About this time, Dr. Bossemeyer diagnosed plaintiff with degenerative disc disease and placed the following work restrictions upon plaintiff:  no pushing/pulling over 25 pounds; no continuous lifting over 25 pounds; no frequent lifting over 25 pounds; no repetitive bending or stooping; no squatting or kneeling; no prolonged standing or working - should be sitting 50% of the time.

On June 21, 2006 plaintiff had a follow-up visit to Dr. Bossemeyer. Plaintiff reported no significant pain and said he wanted to return to work. Dr. Bossemeyer noted that plaintiff's job required him "very intermittently" to lift up to 60 pounds, but for the most part plaintiff lifted 10 or 15 pounds intermittently and drove a forklift. Dr. Bossemeyer wrote that plaintiff could go back to work with no restrictions.

However, plaintiff then traveled by car from Salina, Kansas to Colorado Springs. This aggravated his back pain. When he returned, he saw Dr. Hanson. Dr. Hanson is a physician at the Salina Clinic who is under contract to perform examinations for defendant to determine whether employees on medical leave can return to work. Dr Hanson had previously seen plaintiff for return to work examinations in 2003 and 2005. On June 26, 2006, Dr. Hanson noted that plaintiff felt he was not capable of returning to work. Dr. Hanson found that plaintiff was having "tremendous discomfort." Doc. 95, Ex. 13 at p. 5. He determined that plaintiff had degenerative disc disease and told plaintiff that he was released from work until his personal physician (Dr. Bossemeyer) said otherwise.

Plaintiff received a second epidural steroid injection on June 29, 2006. He indicated on a pain history taken at that time that his pain "just began," not that it was caused by work. He noted that the pain started over two years ago.

Plaintiff saw Dr. Hanson again on July 11, 2006 and reported that his pain was completely gone and he wished to return to work on July 16, 2006. Dr. Hanson approved plaintiff to return to work. Plaintiff did return to work on July 16, 2006.

On August 7, 2006 plaintiff reported to defendant's nurse's station while at work and spoke with Gidget Ramsey, a nurse for defendant. Plaintiff reported that he had pain in his back, perhaps because of working overtime. Plaintiff has testified that he told Ramsey:

> "I'm fresh from feeling better from this injury that I'm off of and then they want to put me working sixty, seventy hours a week on jobs that is not even my job . . . No wonder, you know, I got pain coming back again."

Doc. No. 95, Ex. 28 at p. 10 (p. 47 of plaintiff's deposition). Plaintiff has also testified that he asked Ramsey to help him file a work injury report or a workers' compensation claim. We accept this testimony as true for the purposes of this order.

Nurse Ramsey recorded her recollection of the encounter in a memo which states:

> [Employee] reports to nurse's station & asks what he can do about his back pain. [Employee] then continues to report that he is tired of working 60 hrs a week and feels like maybe his job has caused his back pain. Reports that his doctor did not want to release him to return to work but he said he couldn't live of[f] his STD [short-term disability] check and needed to get back to work. [Employee] was seen by Dr. Hanson on 7/11/06 and reported that his pain was completely gone. Dr. Hanson released him to return to work on 7/16/06. [Employee] reports to this nurse that the pain has never gone away and again says working 60 hrs is crazy and I'm tired of being told that since I have low seniority that it's

> mandatory that I work overtime. Continues to report that
> DC has it's own set of rules & tired of it. Instructed
> [employee] to talk [with] John Pfeiffer about his concern
> [regarding] the overtime. I then instructed [employee]
> to fill out an accident report if he felt like his back
> injury was [due to] his job. [Employee] reported that he
> will talk [with] John Pfeiffer. Ended the conversation
> by reminding [employee] to come back to the nurse's
> station and fill out an accident investigation/incident
> report if he felt this was a work related injury.

Doc. No. 95, Ex. 17. Plaintiff disputes that Nurse Ramsey told him to fill out a work injury report or did anything other than direct plaintiff to speak to John Pfeiffer. The court accepts plaintiff's version of this matter for the purposes of the motion for summary judgment. Plaintiff did not fill out an injury report, and Ramsey did not fill out an injury report for plaintiff.

When Nurse Ramsey does new employee orientation, she explains the employee handbook policy about reporting injuries and points out where the forms for reporting injuries are located. Such forms were available at the nurse's station.

On August 9, 2006, plaintiff received a third epidural steroid injection. He saw Dr. Bossemeyer on August 10, 2006. Dr. Bossemeyer wrote:

> Pt. has a herniated disc. He has had 3 epidurals
> now. They really have not made his back a lot better.
> He is in a less demanding job at work, but he still is
> having problems. He needs to stay at work, if at all
> possible. He has had his last epidural 2 days ago, which
> really is not enough time to know for sure whether this
> one is going to help him or not. He certainly would be
> a difficult person to do surgery on. He is quite large at
> 380-some pounds.
>     No specific objection evaluation was done today.

Doc. 95, Ex. 9 at p. 2.

Plaintiff saw Dr. Bossemeyer because John Pfeiffer, plaintiff's supervisor, called him at home and told him he needed another medical release to come back to work. Dr. Bossemeyer gave plaintiff a note excusing him from work until August 13, 2006. At some point before or after the visit to Dr. Bossemeyer, plaintiff was instructed by defendant not to return to work pending additional medical clearance.

Plaintiff saw Dr. Hanson on August 22, 2006 for a fitness-for-duty examination.[1] By this point, Dr. Hanson had received and reviewed plaintiff's CT scan from June 2006. Dr. Hanson wrote:

> This 36-year-old gentleman finished his third epidural steroid about two weeks ago. He has been given a release to return to work by Dr. Bossemeyer. Even though he is feeling fairly well having been off work this period of time he is concerned that the last two wore off fairly quickly and I am concerned that the CT done on 06/07/06 shows a right paracentral disc herniation at L4-L5 that is associated with right nerve compression and acquired central canal narrowing to 7 mm and at L5-S1 there is moderate to severe narrowing of the disc space with facet joint arthropathy, but there is right neuroforaminal stenosis. There is right nerve compression as well. My biggest fear is that when this gentleman returns back to job description at Exide that when the epidural begin[s] to wear off it may cause further degenerative changes in his back. The patient stated that when he is having discomfort he notices weakness and hesitancy in his right

---

[1] In his deposition, Dr. Hanson was unfamiliar with the term "fitness-for-duty examination" and said that he did not perform such an examination on plaintiff. Doc. No. 102, Ex. E at p. 68. However, the record appears clear that Dr. Hanson saw plaintiff at least three times in 2006, as well as in 2003 and 2005, for the purpose of determining whether plaintiff should be released to return to work.

> leg.  He cannot stand for long or sit for very long, or
> even lie any comfortable position except on his belly.
> . . . .
> The patient has been advised not to return to work, but
> to visit with his personal physician Dr. Bossemeyer and
> to seek an opinion from a neurosurgeon.

Doc. No. 95, Ex. 13 at p. 8.  A medical leave of absence request

form used for FMLA leave was filled out for plaintiff on August 22,

2006.  The form indicates that the request was approved by

plaintiff's supervisor on that date.  However, plaintiff did not

sign the form.

Plaintiff consulted with Dr. Bossemeyer who referred him to

Dr. Manguoglu, a neurosurgeon.  On September 5, 2006 Dr. Manguoglu

noted that plaintiff presented a history of back and bilateral leg

discomfort which started more than a year earlier.  He diagnosed

plaintiff with a large disc herniation at the L4-5 vertebra, a

moderate degree of spinal stenosis, and a large disc bulge at the

L5-S1 vertebra.  Plaintiff told Dr. Manguoglu that his pain had

completely disappeared after his third epidural steroid injection.

The doctor did not recommend surgery, but advised plaintiff against

heavy lifting, bending or twisting.  He also advised plaintiff to

seek treatment from a chiropractor, Dr. Eisenhauer.  Later Dr.

Manguoglu wrote a note indicating that plaintiff's care had been

transferred to Dr. Eisenhauer and that Dr. Eisenhauer would

determine plaintiff's work restrictions.

Plaintiff saw Dr. Eisenhauer on October 9, 2006 and reported

that his pain was a 10 on a 1-to-10 scale.  Plaintiff completed a

pain survey which stated that plaintiff could not lift heavy weights, could not walk more than a quarter mile, could not sit for more than one hour, could not stand for longer than a half-hour, and that his pain was gradually worsening. On October 16, 2006 Dr. Eisenhauer wrote that plaintiff should not work until the completion of a six-week treatment program which began on October 9. He advised at that time that plaintiff should not exert himself or engage in lifting, bending or prolonged sitting or standing. After a series of treatments, Dr. Eisenhauer found that plaintiff responded well to therapy and released plaintiff to return to work on November 27, 2006.

Plaintiff relayed Dr. Eisenhauer's release to defendant and was instructed to see Dr. Hanson. Dr. Hanson saw plaintiff on December 7, 2006. Dr. Hanson wrote that he decided to "follow the radiologist's recommendations to get an MRI so that we can know what we are dealing with and be able to put on appropriate work restrictions." Doc. No. 95, Ex. 13 at p. 8. The MRI was conducted on December 15, 2006 and the results were faxed to Dr. Hanson on December 19, 2006. Dr. Hanson determined that the MRI results were consistent with the CT scan performed in June 2006. He concluded in an undated memo that: "my recommendations are that [plaintiff] avoid repetitive bending, stooping, lifting, twisting and climbing, and to avoid lifting more than 20 pounds." Doc. No. 95, Ex. 13 at p. 9. He further noted that those restrictions were not consistent

with plaintiff's job requirements as a material handler.

On December 21, 2006 plaintiff had a meeting with Jayne Cornish and Cathy Carpenter. Cornish was defendant's human resources manager. She started working for defendant on September 25, 2006. Carpenter was defendant's environmental health and safety supervisor for the Salina plant. During the meeting, plaintiff said he felt fine and could bench press 400 pounds and do other heavy lifting. He was trying to make clear that he had no restrictions and wanted to work. Nevertheless, defendant determined that there was no job which plaintiff could perform at the Salina plant consistent with the physical restrictions placed upon him by Dr. Hanson.[2] Plaintiff asked Cornish whether defendant's position would be different if he claimed his back injury was work-related.[3] Doc. No. 95, Ex. 2 at p. 19 (p. 73 of deposition of Jayne Cornish). Plaintiff, however, never told Dr. Hanson that his back pain was work-related.

Defendant found no other job for plaintiff and plaintiff's employment was terminated on January 23, 2007. The decision to terminate plaintiff was a joint decision of Jayne Cornish and Jim

---

[2] Plaintiff claims that Dr. Hanson never gave him work restrictions. Dr. Hanson may not have told plaintiff the work restrictions he communicated to Jayne Cornish. But, this does not create a jury issue as to what Dr. Hanson told Jayne Cornish.

[3] This statement is referred to in plaintiff's response to defendant's summary judgment motion, although it is not included in either side's list of uncontroverted facts.

York, the plant manager.

Before the discharge decision was made, defendant was aware that Cigna, the insurance company which issued short-term disability insurance for defendant's employees, had rejected plaintiff's claim for short-term disability insurance benefits on the grounds that plaintiff was not disabled from working for defendant as a material handler. This decision was made after Cigna reviewed medical information pertaining to plaintiff. Defendant asked Cigna to reconsider its decision, but the decision was not changed.

On January 16, 2007 Dr. Eisenhauer remarked that plaintiff should not engage in "excessive/repetitive bending or repetitive lifting over 40 pounds." Doc. No. 95, Ex. 19 at p. 12. This statement was made on a form in connection with plaintiff's application for unemployment benefits.

Plaintiff filed for workers' compensation benefits on February 2, 2007. His claim was ultimately denied on the basis that plaintiff failed to establish that he suffered an injury arising from his employment with defendant. In a November 30, 2007 pain survey, plaintiff indicated that lifting objects from 10 to 50 pounds gave him moderate pain, that turning and twisting gave him moderate pain, and rated his ability to return to work as "do not know."

Defendant's records show that plaintiff took FMLA leave and

applied and received short-term disability benefits for the following time periods:

    December 9, 2002 - December 14, 2002
    July 31, 2003 - December 7, 2003
    January 3, 2005 - January 9, 2005
    June 2, 2006 - July 15, 2006; and
    August 10, 2006 - until the exhaustion of his FMLA leave
    and short-term disability benefits.

Before August 2006, plaintiff did not experience any negative feedback or reaction when he took FMLA leave on different occasions while working for defendant. After August 2006, plaintiff was not chastised or criticized for taking leave from work.

Plaintiff received favorable evaluations and excellent marks for his job performance while working for defendant.

III.  PLAINTIFF'S CLAIMS

    A.  Workers' compensation retaliation

Plaintiff claims that he was terminated from employment by defendant because plaintiff sustained a workplace injury for which he might file a workers' compensation claim.

Judge Lungstrum recently discussed the burden shifting approach applied to workers' compensation retaliatory discharge claims under Kansas law:

    Kansas courts use a burden-shifting scheme whereby
    plaintiff is first required to present a prima facie case
    of retaliatory discharge. Rebarchek v. Farmers
    Cooperative Elevator, 272 Kan. 546, 553, 35 P.3d 892
    (2001). To establish a prima facie case for retaliatory
    discharge in the workers' compensation context, plaintiff
    must establish four elements: (1) he filed a claim for
    workers' compensation benefits or sustained an injury for
    which he might assert a future claim for such benefits;

> (2) defendant had knowledge of plaintiff's claim or
> injury; (3) defendant terminated plaintiff's employment;
> and (4) a causal connection exists between the protected
> activity or injury and the termination of plaintiff's
> employment. <u>Id</u>. at 554, 35 P.3d 892. Once plaintiff
> establishes a prima facie case, the burden shifts to
> defendant to articulate a legitimate nonretaliatory
> reason for terminating plaintiff's employment. <u>Id</u>. at
> 557, 35 P.3d 892. If defendant does so, the burden
> shifts back to plaintiff to present evidence tending to
> show that defendant's proffered reason for terminating
> plaintiff's employment is pretextual. <u>Id</u>. If plaintiff
> comes forward with evidence that raises genuine issues
> concerning defendant's motivation, then "he is entitled
> to test his case before a jury." <u>Id</u>. at 558, 35 P.3d
> 892.

<u>Scheffler v. United Parcel Service, Inc.</u>, 689 F.Supp.2d 1300, 1304

(D.Kan. 2010).

Defendant makes four arguments for summary judgment against plaintiff's workers' compensation retaliatory discharge claim. First, defendant argues the doctrine of collateral estoppel. Defendant claims that plaintiff cannot make a prima facie showing that he suffered a workplace injury or that he was retaliated against because he may have suffered a workplace injury, because his workers' compensation claim was denied on the grounds that he did not suffer a workplace injury. We reject this argument. For a prima facie showing, it is enough if plaintiff had a reasonable good faith belief that he suffered a workplace injury and that defendant had knowledge of the injury. See <u>Bausman v. Interstate Brands Corp.</u>, 252 F.3d 1111, 1115 (10th Cir. 2001) (protection against retaliation extended to employees who would be likely to file statutory claims). "The requisite 'causal connection' is the

14

unlawful intent on the part of the employer to terminate the employee because the employee has filed a statutory claim, or has been injured and may file such a claim." Id. at 1116. "It is what the employer knew or should have known at the time of the discharge that is critical to a plaintiff's prima facie case and not what a plaintiff may or may not be able to prove sometime after the discharge as to the actual cause of his absences." Wilkins v. Kmart Corporation, 2006 WL 3333744 at *9 (D.Kan. 11/16/2006). In this case, at the time of plaintiff's discharge defendant knew or arguably should have known that plaintiff suffered an injury in August 2006 for which he reasonably could make a claim for workers' compensation benefits.

Next, defendant argues that plaintiff cannot make a prima facie showing of a retaliatory discharge because he and the doctors who treated him continually indicated that his back pain was not work related. The court also rejects this argument. The alleged injury is consistent with the type of work plaintiff performed for defendant. When he reported to the nurse's station on August 7, 2007, his comments (as described in plaintiff's deposition and the nurse's written statement) could be construed as reporting a workplace injury. In addition, plaintiff suggested to Jayne Cornish that he might claim the back injury was caused at work during the December 21, 2006 meeting. Construing the evidence in a light most favorable to plaintiff, a reasonable jury could find

that plaintiff had a reasonable good faith belief that he suffered a workplace injury.

Defendant's third argument is that plaintiff cannot establish a causal connection between his alleged workplace injury and his termination from employment. Plaintiff was told to stay home from work shortly after he allegedly reported a workplace injury. He was terminated a few weeks after he suggested to Jayne Cornish that he might make a workers' compensation claim. Although there are contradictory reports in the record which are based upon plaintiff's statements to doctors or defendant's representatives, there is enough evidence in the record for the court to find that plaintiff could make a prima facie showing of a causal connection between his alleged workplace injury and his discharge from employment. See Rebarchek, 35 P.3d at 901 (a prima facie case is not an "onerous burden" in this type of case).

Finally, defendant contends that summary judgment is warranted because the undisputed evidence shows that plaintiff was discharged because defendant believed he was unable to safely perform his work duties. Defendant has produced evidence that the decision to terminate plaintiff was based upon Dr. Hanson's opinion that plaintiff could not perform the duties of the material handler position. According to defendant, plaintiff has not produced evidence which, viewed in a light most favorable to plaintiff, would persuade a reasonable factfinder that defendant's alleged

reason for terminating plaintiff is a pretext for a retaliatory discharge.  We agree with this argument.

"A plaintiff produces sufficient evidence of pretext when [he] shows 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  Jones v. Oklahoma City Public Schools, ___ F.3d ____, 2010 WL 3310226 at *7 (10th Cir. 2010) (quoting Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005)).  "When evaluating the sufficiency of this evidence, we look to several factors, 'includ[ing] the strength of the [employee's] prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered' on a motion for summary judgment."  Id., quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148-49 (2000).

Typically pretext is shown in one of three ways:  1) with evidence that defendant's stated reason for the adverse employment action was false or unworthy of belief; 2) with evidence that defendant acted contrary to a written company policy; or 3) with evidence that defendant acted contrary to an unwritten policy or contrary to company practice.  Kendrick v. Penske Transp. Services,

Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). Evidence of pretext may include: prior treatment of plaintiff; the employer's policies and practices; disturbing procedural irregularities; and the use of subjective criteria. Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.), cert. denied, 528 U.S. 815 (1999). "'[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'" Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) quoting, Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

To summarize the factual record, plaintiff missed a significant amount of work in June and July 2006 because of back pain. He returned to work in late July 2006 with a release from Dr. Hanson. This was in accord with previous company practice. After he resumed working in late July and early August, plaintiff again reported back pain on August 7, 2006. He obtained a third epidural steroid shot on August 9, 2006 and saw his personal physician on August 10, 2006 which led to time off at least until August 13, 2006. At some point about this time plaintiff was told by defendant not to return to work. Plaintiff's next medical visit was with Dr. Hanson on August 22, 2006. After reviewing a CT scan done in June, Dr. Hanson told plaintiff not to return to work, but to see his personal physician and obtain a consultation from a neurosurgeon. The neurosurgeon, Dr. Manguoglu, did not recommend

surgery because plaintiff said he was pain-free.[4]  Plaintiff was referred to a chiropractor, Dr. Eisenhauer, who placed restrictions on plaintiff against exertion, lifting, bending and prolonged sitting or standing, and scheduled him for several treatments. When these treatments were about completed, Dr. Eisenhauer released plaintiff to work on November 27, 2006 and plaintiff was scheduled for a return-to-work examination by Dr. Hanson.  Dr. Hanson decided to order an MRI.  Plaintiff had the MRI on December 15, 2006.  The MRI was consistent with a CT scan conducted in June 2006 which showed spinal stenosis and a disc herniation.  Dr. Hanson informed defendant on or about December 19, 2006 that plaintiff was not capable of performing the duties of a material handler.  He said that plaintiff should avoid repetitive bending, stooping, lifting, twisting and climbing and should avoid lifting more than twenty pounds.  Jayne Cornish and Cathy Carpenter met with plaintiff to inform him of this conclusion on December 21, 2006.  In January 2007, Dr. Eisenhauer wrote that plaintiff should not engage in excessive or repetitive bending, or repetitive lifting over forty pounds.

Plaintiff makes the following arguments in support of a claim of pretext.  First, plaintiff asserts that defendant refused to honor the work "releases" plaintiff obtained from other doctors.

---

[4] Dr. Manguoglu did warn plaintiff against heavy lifting, twisting or bending.

We reject this point. The record shows that Dr. Eisenhauer issued a work release for plaintiff in late November 2006. This is the only work release near the time that plaintiff was discharged. While this work release and other evidence are sufficient to establish an issue as to plaintiff's ability to do his job with defendant at the point in time, that is not the issue in this case. The issue is whether defendant believed plaintiff could safely perform his job. Looking at all the evidence, the court does not believe Dr. Eisenhauer's release together with the other evidence of plaintiff's ability to work is sufficient to establish a jury issue as to pretext.

Plaintiff had a history of back trouble. In December 2006, consistent with defendant's past practice, Dr. Hanson saw plaintiff to determine whether he should be released to work. Dr. Hanson ordered a MRI. After reviewing the MRI and finding that it did not vary from a prior CT scan, Dr. Hanson refused to release plaintiff to work as a material handler for defendant. This is consistent with Dr. Hanson's conclusion in August 2006 when he first saw the CT scan. Dr. Hanson's decision is not greatly inconsistent with Dr. Eisenhauer's January 2007 statement that plaintiff should not do repetitive bending or repetitive lifting over forty pounds. Nor does it vary greatly from Dr. Bossemeyer's August 2006 statement that plaintiff was still having problems in a less demanding job or Dr. Manguoglu's advice in September that plaintiff avoid heavy

lifting, bending or twisting and that he see a chiropractor.

The job of senior material handler required the occasional lifting of 40 pounds. It also required the ability to do a material handler's job which required occasional lifting of 80 pounds. Both positions involved bending and twisting. We do not believe the evidence from other doctors, including Dr. Eisenhauer, would persuade any reasonable factfinder that Dr. Hanson's opinion was unreasonable, unworthy of belief or obtained in bad faith. Nor would it show that defendant's reliance upon Dr. Hanson's opinion was unreasonable, contrary to company practice or policy, or a pretext for retaliation.

Next, plaintiff contends that defendant's decision to remove plaintiff from work in August 2006 without a medical leave form signed by plaintiff or a doctor's statement is evidence of pretext. While this may have been a procedural irregularity, it is not so disturbing as to create a significant inference of pretext. Plaintiff reported back discomfort on August 7, 2006. He had a third epidural steroid shot on August 9, 2006. He was given a release from work by his personal physician until August 13, 2006 who indicated that plaintiff was "still having problems." Then, on August 22, 2006, Dr. Hanson advised plaintiff not to return to work and noted that plaintiff could not stand or sit for very long. He also advised plaintiff to obtain a surgical consultation. On that day a leave form was filled out and approved by plaintiff's

supervisor, although plaintiff did not sign the form. Of course, all of these events preceded the decision to discharge plaintiff by a few months. Viewing the entire record, the court does not believe the absence of plaintiff's signature on a leave form or a doctor's order covering all the days of work plaintiff missed in August, creates a jury issue as to whether defendant's reasons for eventually terminating plaintiff were a pretext for retaliation.

Plaintiff contends that Nurse Ramsey's refusal to file an injury report on August 7, 2006 shows that the decision to terminate his employment was motivated to retaliate against him because he may have sustained a workplace injury. Nurse Ramsey did not participate in the decision to terminate plaintiff. Therefore, her reaction to defendant's complaint on August 7, 2006 is not evidence that the medical reasons given for the decision of Jayne Cornish and Jim York to discharge plaintiff were a pretext for retaliation. Jayne Cornish was not working for defendant in August 2006. So, she had nothing to do with Ramsey's actions. Moreover, there is no evidence that Ramsey was acting in accordance with a company policy or practice to retaliate against persons who reported workplace injuries on August 7, 2006. On the contrary, there is evidence that new employees were instructed to report workplace injuries and were told where to find the forms to do so.

Plaintiff claims that the proximity in time between his alleged references to a workplace injury and his temporary and then

permanent exclusion from work at defendant's plant shows that the reasons given for his termination were a pretext for retaliation. Plaintiff allegedly reported a workplace injury to Nurse Ramsey on August 7, 2006 and then referred to the injury again in that context on December 21, 2006 when he met with Jayne Cornish and Cathy Carpenter. Plaintiff was told not to come to work in mid-August 2006 and was discharged on January 23, 2007. The Tenth Circuit has held that temporal proximity is not sufficient by itself to establish pretext. Proctor v. United Parcel Service, 502 F.3d 1200, 1213 n.6 (10th Cir. 2007). Even considered with plaintiff's other arguments, the court does not believe that the timing of the adverse actions against plaintiff raises a jury issue as to whether defendant's alleged reasons for the actions were a pretext for retaliation.

Finally, plaintiff contends that defendant was willing to give plaintiff time off and then allow plaintiff to return to work when plaintiff reported a non-workplace injury. According to plaintiff, it was only when he reported a workplace injury that defendant would not permit him to return to work. Plaintiff contends that this shows pretext. Dr. Hanson released plaintiff to return to work in July 2006 and previous occasions. Dr. Hanson did not release plaintiff to return to work in August or December 2006. There is no evidence that Dr. Hanson's decisions were influenced by whether plaintiff's injuries occurred at work or off work.

Plaintiff did not tell Dr. Hanson that he suffered a workplace injury. Therefore, the conjuncture of plaintiff's alleged off-the-job and on-the-job injuries and the permission to return to work does not demonstrate pretext. The critical factor in Dr. Hanson's decision appears to be his review of the CT scan and the MRI. Dr. Hanson did not see the CT scan until after August 7, 2006, and he saw the MRI on or about December 19, 2006. In both instances, Dr. Hanson did not release plaintiff to return to work.

In summary, defendant's reliance upon Dr. Hanson's opinion is not inconsistent or implausible. It may be argued that there is contrary medical opinion in the record. Such countervailing evidence suggests that Dr. Hanson was mistaken. But, it does not show that defendant's reliance upon Dr. Hanson's opinion was a pretext for retaliation or discrimination. The relevant issue for the purposes of showing pretext is not whether plaintiff could have safely performed the job of material handler. Instead, it is whether defendant honestly perceived that plaintiff could not safely perform the job of material handler because of his medical condition. See Chen v. Dow Chemical Co., 580 F.3d 394, 401 (6th Cir. 2009) (quoting Clay v. United Parcel Serv., Inc., 501 F.3d 695, 713-15 (6th Cir. 2007))("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or

baseless.'"); <u>Metzler v. Federal Home Loan Bank</u>, 464 F.3d 1164, 1178 (10th Cir. 2006)(a mistaken belief can be a legitimate reason for an employment decision); <u>Proctor</u>, 502 F.3d at 1211 (same); <u>Riggs v. AirTran Airways, Inc.</u>, 497 F.3d 1108, 1118-19 (10th Cir. 2007)(same); <u>Hardy v. S.F. Phosphates Ltd. Co.</u>, 185 F.3d 1076, 1080 (10th Cir. 1999) (employer's perception of employee's performance is the critical question); <u>Schauer v. BNSF Railway Co.</u>, 2009 WL 262110 at *6 (D.Neb. 2009) (plaintiff cannot survive summary judgment simply by showing that medical opinions relied upon by defendant might be wrong). This can be a "fine line." See <u>Wagner v. Caterpillar Inc.</u>, 1997 WL 625966 at *11 (7th Cir. 9/30/1997)(a workers' compensation retaliation case involving a job termination where an employer believed an employee lied about his physical condition). The court concludes on this record that the evidence does not show such weakness, inconsistency or implausibility in defendant's reliance upon Dr. Hanson's opinion that a jury issue is raised as to the issue of pretext. Therefore, the court shall grant summary judgment against plaintiff's state law retaliatory discharge claim.

B. <u>FMLA claims</u>

Plaintiff alleges that defendant violated the FMLA by retaliating against plaintiff for taking leave allowed by the FMLA, forcing plaintiff to take an unwanted medical leave of absence, and failing to reinstate plaintiff when he was released to return to

work.

The FMLA provides that eligible employees have the right to take unpaid medical leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act.  29 U.S.C. §§ 2601-2654.  The FMLA also requires employers to reinstate an employee to his or her former position or its equivalent upon the employee's timely return from FMLA leave.  29 U.S.C. § 2614(a).

The Tenth Circuit discussed the two types of FMLA claims which may be alleged in Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960 (10th Cir. 2002).

> Employees are authorized under 29 U.S.C. § 2617(a) to bring an action to recover damages for violations of § 2615.  Courts have recognized two theories for recovery on FMLA claims under § 2615, the retaliation or discrimination theory and the entitlement or interference theory.  The retaliation or discrimination theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  The entitlement or interference theory arises from § 2615(a)(1):  "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."

The Tenth Circuit has held that retaliation claims are subject to the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Metzler, 464 F.3d at 1170.

> "Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation. If plaintiff does so, then the defendant must offer a legitimate, nonretaliatory reason for the employment

> action. The plaintiff then bears the ultimate burden of
> demonstrating that the defendant's proffered reason is
> pretextual."

Id. (citations omitted). Interference with FMLA rights is a statutory violation regardless of the employer's intent. Id. So, the burden-shifting analysis does not apply to interference claims. Id.

### 1. Retaliation or discrimination

To establish a prima facie case of retaliation, plaintiff must show: 1) that he engaged in protected activity; 2) that defendant took a materially adverse action against plaintiff; and 3) that there exists a causal connection between the protected activity and the adverse action. Id. at 1171.

Defendant admits that plaintiff can establish the first two elements of a prima facie case of retaliation. Defendant contends that summary judgment is warranted because plaintiff cannot show a causal connection between FMLA protected activity and any adverse job action, and because plaintiff cannot ultimately prove that defendant's reasons for directing plaintiff not to return to work and for discharging plaintiff were a pretext for illegal retaliation or discrimination. Defendant asserts that the record demonstrates that plaintiff was removed from work and not reinstated because of his back condition. Defendant also notes that plaintiff admits that he had previously used FMLA leave without retaliation or discrimination by defendant.

Plaintiff makes several arguments in opposition to summary judgment against his FMLA retaliation or discrimination claim. We reject these arguments.

First, plaintiff contends that the burden shifting analysis is unnecessary and inappropriate because plaintiff has direct evidence of discriminatory or retaliatory intent. According to plaintiff, this evidence is defendant's admission that plaintiff was removed from work and ultimately discharged because of his back condition. Plaintiff relies upon cases brought under the Americans with Disabilities Act (ADA).[5] Those cases do not apply here. Defendant does not admit that plaintiff suffered an adverse job action because he had a back condition which caused him to take and eventually exhaust his FMLA leave. Defendant admits only that plaintiff suffered an adverse job action because he had a back condition which defendant believed disqualified him from performing his job requirements. Defendant's admission is not direct evidence of discriminatory or retaliatory intent to violate the FMLA.

Second, plaintiff contends that defendant, through its human resources manager Jayne Cornish, engaged in a pattern and practice of FMLA retaliation. However, plaintiff has not presented evidence to support this contention other than a reference to cases filed

---

[5]Plaintiff quotes language which appears to come from <u>Davidson v. American Online, Inc.</u>, 337 F.3d 1179, 1189 (10th Cir. 2003) which, in turn, quotes from <u>Morgan v. Hilti</u>, 108 F.3d 1319, 1323 n.3 (10th Cir. 1997). However, plaintiff does not directly cite to the <u>Davidson</u> case. Doc. No. 102 at pp. 88-89.

against defendant.  It should also be noted that Cornish started her employment with defendant in late September 2006, after Dr. Hanson on August 22, 2006 initially refused to release defendant back to work.

Next, plaintiff contends that defendant ignored the work releases from three doctors, Dr. Manguoglu, Dr. Bossemeyer and Dr. Eisenhauer.  The court has addressed this point with regard to the workers' compensation retaliation claim and the court's analysis will be somewhat the same.  We agree with defendant that Dr. Manguoglu did not issue a work release to defendant.  He simply transferred plaintiff's care to Dr. Eisenhauer.  Dr. Bossemeyer gave plaintiff a note excusing him from work from August 9, 2006 to August 12, 2006.  However, if Dr. Bossemeyer released plaintiff to work thereafter, the release appeared qualified with language indicating that plaintiff was in a less demanding job (when plaintiff's job description did not change), that plaintiff was still having problems, and that no specific objective evaluation had been done.  Moreover, plaintiff can hardly claim that he was retaliated against for using FMLA leave, if defendant afforded him such leave even though his personal physician said he could return to work.

Some weeks after plaintiff had exhausted his FMLA leave (according to defendant's calculations), Dr. Eisenhauer gave plaintiff a release to work beginning November 27, 2006.  Once

again, Dr. Eisenhauer's release to return to work should not be considered evidence of FMLA retaliation when defendant continued to allow plaintiff leave from work, before and after Dr. Eisenhauer's release, in spite of the fact that plaintiff had exhausted his FMLA leave.

As previously discussed, the court does not believe the medical testimony and records in this case could demonstrate to any reasonable jury that defendant retaliated or discriminated against plaintiff or that defendant's reliance upon Dr. Hanson's refusal to return plaintiff to his job was a pretext for retaliation or discrimination. The records do not show that the support for Dr. Hanson's opinion is so weak or that defendant's reliance upon Dr. Hanson's opinion is so implausible or inconsistent that a reasonable jury could find that defendant used the opinion as a pretext for FMLA retaliation.

Plaintiff also argues that Dr. Hanson was simply obeying the instructions of defendant when Dr. Hanson removed plaintiff from work and refused to reinstate plaintiff to work. We disagree. The evidence in the record does not show or even suggest that Dr. Hanson received or obeyed a directive from defendant to prevent plaintiff from returning to work.

Plaintiff contends that defendant's reliance upon Dr. Hanson's opinion was a pretext for retaliation or discrimination because Dr. Hanson did not examine plaintiff in December 2006. Dr. Hanson did

see plaintiff on December 7, 2006 and ordered an MRI. Later, he reviewed the MRI findings. He was familiar with plaintiff's medical history, work history and the job requirements for plaintiff's position with defendant. Dr. Hanson did not issue a knee-jerk opinion that plaintiff could not return to work. We find that the absence of a detailed examination does not demonstrate that defendant's trust in Dr. Hanson's opinion was merely a pretext for retaliation or discrimination.

Plaintiff further argues that the insurance company rendered a conclusion that plaintiff was not disabled from his job as a material handler when the company reviewed plaintiff's application for short-term disability benefits. This is evidence of a disagreement as to plaintiff's ability to perform the job of material handler. It is not evidence of pretext. It does not demonstrate that employees who did not take FMLA leave were treated more favorably. It does not demonstrate that defendant ignored Dr. Hanson's opinion with employees who did not take FMLA leave. It also does not demonstrate that defendant directed or manufactured Dr. Hanson's opinion or that defendant lacked good cause to rely upon Dr. Hanson's opinion. It simply shows that there was a disagreement regarding the ability of an employee with a history of back trouble to safely perform the physical demands of a material handler position. Defendant asked the insurance company to review or reconsider its decision which is also an indication that

defendant's reliance upon Dr. Hanson's opinion was not a pretext for retaliation or discrimination.

Finally, plaintiff asserts that defendant never placed plaintiff on FMLA leave or at least there is no documentation that plaintiff was placed on FMLA leave. However, if plaintiff was not placed on FMLA leave, then plaintiff cannot establish that he was retaliated against or discriminated against for taking FMLA leave.

As with plaintiff's claim of workers' compensation retaliation, the record does not support a jury issue of pretext as to FMLA retaliation. Plaintiff was not retaliated against or penalized by defendant when he took FMLA leave prior to August 2006. The record does not support a jury question as to whether defendant's reliance upon Dr. Hanson's opinion was a pretext for FMLA retaliation. Defendant's position has not been demonstrated to be implausible, inconsistent or incoherent. While there is contradictory medical opinion in the record, that evidence does not show that the support for Dr. Hanson's opinion is so weak or that defendant's reliance upon Dr. Hanson's opinion is so unreasonable that a jury issue exists as to pretext. Therefore, the court shall grant summary judgment against plaintiff's claim of FMLA retaliation or discrimination.

## 2. Interference or entitlement

Plaintiff argues that defendant illegally interfered with plaintiff's FMLA rights by placing him on FMLA leave involuntarily

and by refusing to honor plaintiff's request to return to his job as a material handler.

Following the Tenth Circuit's approach in <u>Metzler</u>, 464 F.3d at 1180 and <u>Bass v. Potter</u>, 522 F.3d 1098, 1102 n.5 (10th Cir. 2008), the court believes an FMLA interference claim has the following elements: 1) that plaintiff was entitled to FMLA leave or reinstatement, 2) that some adverse action by the employer interfered with plaintiff's right to take FMLA leave or be reinstated to his job, and 3) that the employer's action was related to the exercise or attempted exercise of plaintiff's FMLA rights.

### a. <u>Involuntary leave</u>

Plaintiff claims that defendant interfered with his FMLA rights by forcing plaintiff to take FMLA leave when plaintiff wanted to work and was physically able to return to work. The Sixth Circuit has held that there may be an FMLA interference claim when an employee is denied FMLA leave because the employee had already exhausted the available FMLA leave after the employer forced the employee to use FMLA leave when the employee did not have a serious health condition. <u>Wysong v. Dow Chemical Co.</u>, 503 F.3d 441, 449-50 (6th Cir. 2007). That scenario does not fit the facts of this case because plaintiff was not denied FMLA leave requested by plaintiff. Plaintiff was terminated allegedly because defendant determined he was not physically qualified to perform his

job.  Other courts have held that there is no cause of action under the FMLA for forcing an employee to take FMLA leave.  See <u>Sista v. CDC Ixis North America, Inc.</u>, 445 F.3d 161, 174-75 (2nd Cir. 2006) (involuntary leave does not violate FMLA unless shown to impinge upon some right provided under the FMLA); <u>Willis v. Coca Cola Enterprises, Inc.</u>, 445 F.3d 413, 417 (5th Cir. 2006) (it is not contrary to the FMLA for an employee to be placed on "involuntary FMLA leave"); <u>Heyne v. HGI-Lakeside Inc.</u>, 589 F.Supp.2d 1119, 1128 (S.D.Iowa 2008) (same).  On the basis of this authority, and because plaintiff does not claim that his right to take FMLA leave was interfered with by his involuntary placement on FMLA leave, the court shall grant summary judgment against this part of plaintiff's interference claim.

### b.  <u>Right to reinstatement</u>

As noted previously, the FMLA requires that an "employee be restored by the employer to the position of employment held by the employee when the [FMLA] leave commenced."  29 U.S.C. § 2614(a)(1)(A).  It is unlawful for any employer to interfere with this right.  29 U.S.C. § 2615(a)(1).  The deprivation of this right is a violation regardless of the employer's intent.  <u>Smith v. Diffee Fort-Lincoln-Mercury</u>, 298 F.3d 955, 960 (10th Cir. 2002).

One of defendant's arguments against this claim is that plaintiff's FMLA leave had expired long before November 27, 2007 and, therefore, plaintiff was not entitled to reinstatement to his

job even if he was physically able to perform the job.  We find that this argument warrants summary judgment.  Various courts have held that the right to reinstatement under FMLA expires when FMLA leave expires.  <u>Conoshenti v. Public Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 148 (3d Cir. 2004) (employee subject to discharge on the first day he is both absent from work and no longer protected by FMLA); <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>, 183 F.3d 155, 161-62 (2nd Cir. 1999) (no interference claim when plaintiff was unable to perform his job for two months after expiration of his 12-week FMLA period); <u>McGregor v. Autozone, Inc.</u>, 180 F.3d 1305, 1308 (11th Cir. 1999) (employee absent for more than protected period time does not have right of reinstatement even if employer provides more leave than required by FMLA); <u>Ackerman v. Beth Israel Cemetery Ass'n</u>, 2010 WL 2651299 (D.N.J. 2010) (once an employee has been provided with 12 weeks of leave, the employer's obligations under the FMLA expire); <u>Eklind v. Cargill Inc.</u>, 2009 WL 2516168 (D.N.D. 2009) (extension of leave time beyond that required by FMLA does not extend right to restoration of job); <u>Talkin v. Deluxe Corp.</u>, 2007 WL 1469648 at *4-5 (D.Kan. 2007) (plaintiff who returns after exhausting FMLA leave cannot state an entitlement claim under the FMLA); <u>Mondaine v. American Drug Stores, Inc.</u>, 408 F.Supp.2d 1169, 1206 (D.Kan. 2006) (employee is only protected under FMLA if he reports for work with the required certification when his FMLA leave concludes); <u>Standifer v. Sonic-Williams Motors,</u> 401 F.Supp.2d

1205, 1221-22 (N.D.Ala. 2005) (employee not entitled to reinstatement because she took 13 weeks, not 12 weeks, off work); Doqmanits v. Capital Blue Cross, 413 F.Supp.2d 452, 462 (E.D.Pa. 2005) (employees who exceed 12 weeks leave stand to lose right to job restoration under FMLA even if employers provided additional non-FMLA leave); Farina v. Compuware Corp., 256 F.Supp.2d 1033, 1054 (D.Ariz. 2003) (plaintiff who took longer than 12-week leave not entitled to reinstatement unless she was prepared to return within the period of FMLA leave allowed); Smith v. Blue Dot Service Co., 283 F.Supp.2d 1200, 1205-06 (D.Kan. 2003) (holding that a plaintiff who was unable to return to work before his FMLA leave expired did not allege any denial of an FMLA right); Hanson v. Sports Authority, 256 F.Supp.2d 927, 936 (W.D.Wis. 2003) (employee may be terminated if she does not have required medical certification at the time FMLA leave concludes); Holmes v. e.spire Communications, 135 F.Supp.2d 657, 666-67 (D.Md. 2001) (there is no FMLA remedy for restoration of job after the expiration of FMLA leave in spite of employer's policy granting additional leave); Hite v. Biomet, Inc., 53 F.Supp.2d 1013, 1017-18 (N.D.Ind. 1999) (stating that while an employer may grant an employee more than 12 weeks leave, the additional time is not protected leave subject to the FMLA safeguards); but see Santosuosso v. Novacare Rehabilitation, 462 F.Supp.2d 590, 597-98 (D.N.J. 2006) (employee did not lose FMLA protection by taking a leave longer than 12 weeks

where her employer gave her permission to do so).

We find that defendant did not interfere with plaintiff's right to reinstatement under FMLA because plaintiff's FMLA right to reinstatement expired when plaintiff's FMLA-authorized leave expired.

IV.   CONCLUSION

In conclusion, for the above-state reasons, defendant's motion for summary judgment shall be granted.

**IT IS SO ORDERED.**

Dated this 13th day of October, 2010 at Topeka, Kansas.

                                 s/Richard D. Rogers
                                 United States District Judge